FENDI ADELE S.R.L., Fendi S.R.L.,
and Fendi North America, Inc.,
Plaintiffs,

v.

FILENE'S BASEMENT, INC. and
Retail Ventures, Inc.,
Defendants.

No. 06 Civ. 244(RMB)(MHD).

United States District Court,
S.D. New York.

March 11, 2010.

Richard L. Mattiaccio, Victor Genecin, Steven Skulnik, Squire, Sanders & Dempsey, L.L.P., New York, NY, for Plaintiffs.

Kenneth Alan Plevan, Skadden, ARPS, Slate, Meagher & Flom LLP, New York,

NY, Theodore Ray Remaklus, Wood, Herron & Evans, L.L.P, Cincinnati, OH, for Defendants.

### DECISION & ORDER

RICHARD M. BERMAN, District Judge.

## I. Introduction

On January 12, 2006, Fendi Adele S.r.l., Fendi S.r.l., and Fendi North America, Inc. (collectively, "Fendi" or "Plaintiffs") filed a complaint against Filene's Basement, Inc. ("Filene's") and Retail Ventures, Inc. ("Retail Ventures" or "RVI") (collectively, "Defendants") pursuant to the United States Trademark Act, 15 U.S.C. §§ 1051 et seq. ("Lanham Act"), Section 360-l of the New York General Business Law, and New York common law ("Fendi Litigation").[1] (Compl., dated Jan. 11, 2006 ("Compl."), ¶¶ 1–3.) Plaintiffs allege, among other things, that Defendants' "offering for sale and selling [of] handbags, shoulder bags, purses, wallets and key chains . . . that imitate the designs of [Fendi products] and that bear reproductions, counterfeits, copies or colorable imitations of the 'FENDI' trademarks" constituted trademark counterfeiting, false designation of origin, and trademark dilution under Federal law, and unfair competition and trademark dilution under New York law. (Compl.¶¶ 1–3, 38.) Defen-

dants assert affirmative defenses including laches and acquiescence. (Answer, dated Mar. 20, 2006 ("Answer"), ¶¶ 98–99.)

On March 4, 2009, Plaintiffs filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") arguing, among other things, that: (1) there is no legal or factual basis for Defendants' affirmative defenses; (2) "summary judgment is warranted on [P]laintiffs' Lanham Act claims of trademark counterfeiting and false designation of origin" because Defendants' "use in commerce of the Fendi trademarks is shown by uncontroverted evidence"; (3) "[p]roof of trademark counterfeiting and unfair competition under the Lanham Act also proves . . . common law unfair competition"; (4) Plaintiffs are entitled to summary judgment for trademark dilution under 15 U.S.C. § 1125(c) because "Defendants admit that they used the Fendi name and trademarks in commerce after the marks had become famous," and under New York law because "Defendants' use of identical marks is not only confusing, but constitutes a whittling away of the distinctive nature of [P]laintiffs' valuable trademarks"; (5) Plaintiffs are entitled to a permanent injunction pursuant to 15 U.S.C. § 1116(a); (6) Plaintiffs are entitled to an order, pursuant to 15 U.S.C. § 1118, "directing the destruction

1. On May 4, 2009, Filene's filed a voluntary petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"). (Chapter 11 Petition, [# 1], No. 09–11525 (Bankr.D.Del. May 4, 2009).) On June 25, 2009, pursuant to a motion filed by Fendi, United States Bankruptcy Judge Mary F. Walrath entered an order ("Stay Order") "lift[ing] the automatic stay pursuant to 11 U.S.C. § 362 for the limited purpose of enabling the continuation of [the instant Fendi Litigation] . . . with respect to [Fendi's] motion for summary judgment and the Defendants' cross-motion for partial summary judgment (the 'Pending Summary Judgment Motions'), any

further briefing or argument necessary to render the Pending Summary Judgment Motions ready for disposition by the District Court, and entry of an Order, Judgment, or other decision by the District Court with respect to the Pending Summary Judgment Motions[.]" (Agreed Order Granting Limited Relief with Respect to Motion of Fendi for Relief from Stay, [# 420], No. 09–11525 (Bankr.D. Del. June 25, 2009).) At oral argument on March 1, 2010, Fendi's counsel represented that Retail Ventures "is not part of the bankruptcy" and that "[t]here's no stay with respect to [Retail Ventures]." (Tr. of Proceedings, dated Mar. 2, 2010 ("Hr'g Tr."), at 2:15–17.)

of counterfeit and other infringing goods in Defendants' possession"; and (7) Plaintiffs are entitled to an accounting of Defendants' profits because "Defendants' willfulness is established by the testimony of [Defendants'] own employees[.]" (Pls.' Mem. of Law in Supp. of Their Mot. for Summ. J., dated Feb. 27, 2009 ("Pl. Mem."), at 7–12 (quotations omitted), 16, 22–24.)

On May 1, 2009, Defendants filed an opposition and crossmotion for partial summary judgment arguing, among other things, that: Defendants have "valid" affirmative defenses of laches and acquiescence; there are "genuine issues" whether the Fendi items were counterfeit; "significant evidence show[s] that genuine Fendi merchandise is often available in grey market channels"; Fendi "seriously overreaches" in its request for injunctive relief; and the "absence of bad faith by Filene's" is supported by "substantial evidence[.]" (Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Defs.' Cross-motion for Partial Summ. J., dated Apr. 15, 2009 ("Def. Mem."), at 1–4 (capitalization omitted).) Defendants also argue that Retail Ventures should be dismissed as a Defendant because it "did not sell any merchandise, and there is no basis to 'pierce the corporate veil.'" (Def. Mem. at 19–24.) And, Defendants argue: that "Fendi's damages expert report should be stricken"; and that "references to all Fendi marks that cannot support a statutory damages claim" should be stricken from Fendi's Complaint and Rule 56.1 Statement. (Def. Mem. at 19–24.)

On August 13, 2009, Plaintiffs filed a reply and opposition to Defendants' crossmotion arguing that because Retail Ventures "acted jointly with Filene's . . . there is no need to pierce the corporate veil";

Defendants' motion to strike the report of Fendi's damages expert should be denied; and "the question of [D]efendants' exposure to statutory damages need not be addressed unless . . . [P]laintiffs elect statutory damages" at trial. (Pls.' Mem. of Law in Opp'n to Defs.' Cross-motion to Strike and for Partial Summ. J. and Reply Mem. in Further Supp. of Pls.' Mot. for Summ. J., dated Aug. 11, 2009 ("Pl. Reply"), at 1–7 (capitalization omitted), 20–21, 24.)

On September 1, 2009, Filene's and Retail Ventures each filed reply memoranda. (Reply Mem. in Supp. of Mot. by Def. Filene's for Partial Summ. J. on Certain Issues, dated Sept. 1, 2009 ("Filene's Reply"); Reply Mem. in Supp. of Mot. by Def. Retail Ventures for Summ. J., dated Sept. 1, 2009 ("RVI Reply").)

On February 11, 2010, Plaintiffs wrote to the Court enclosing an allegedly "directly relevant" February 8, 2010 decision by United States District Judge Leonard B. Sand granting summary judgment to Fendi on trademark counterfeiting, trademark dilution, and common law unfair competition claims against Burlington Coat Factory Warehouse Corporation ("Burlington Coat Factory") and Cohoes Fashion, Inc., a wholly-owned subsidiary of Burlington Coat Factory (collectively, "Burlington").[2]

As noted, on March 2, 2010, the Court heard oral argument. (*See* Hr'g Tr.)

**For the reasons set forth below, Plaintiffs' motion for summary judgment is granted in part and denied in part. Defendants' crossmotion for partial summary judgment is denied.**

## II. Background

Fendi Adele S.r.l., an Italian limited liability company, is the "owner of the . . .

**2.** *See* Letter from Richard L. Mattiaccio to Hon. Richard M. Berman, dated Feb. 11, 2010 (citing *Fendi Adele S.R.L. v. Burlington* *Coat Factory Warehouse Corp.*, 689 F.Supp.2d 585, 592–93, 594–97 (S.D.N.Y.2010)); *see also* pp. 383–85, *infra.*

federally registered Fendi trademarks and of all other intellectual property rights associated with merchandise bearing any of the Fendi trademarks" and "the exclusive designer of all handbags, shoulder bags, purses, wallets, and key holders that bear any Fendi trademark (the 'Products')." (Compl. ¶ 5; Pls.' Statement Pursuant to Local Civil Rule 56.1, dated Feb. 27, 2009 ("Pl. 56.1"), ¶¶ 1–2; Defs.' Resp. to Pls.' Statement Pursuant to Local Civil Rule 56.1, dated Apr. 15, 2009 ("Def. 56.1"), ¶¶ 1–2.) Fendi Adele S.r.l. has held the following United States Patent and Trademark Office ("USPTO") registration numbers for at least five years: Nos. 1,214,472; 1,244,466; 1,439,955; 2,648,256; and 2,648,257 (collectively, "Fendi Marks"). (Pl. 56.1 ¶ 20; Def. 56.1 ¶ 20; see Decl. of Victor Genecin, dated Feb. 27, 2009 ("Genecin Decl."), Exs. 1–5 (USPTO Certificates of Registration).) The Fendi Marks "have acquired great value and have become well known to the consuming public and trade as identifying and distinguishing FENDI exclusively and uniquely as the source of the merchandise to which the trademarks are applied." (Compl. ¶ 21; Answer ¶ 21.)

Retail Ventures is an Ohio corporation with its principal place of business in Columbus, Ohio. (See Pl. 56.1 ¶ 10; Def. 56.1 ¶ 10.) Filene's, a Delaware corporation with its principal place of business in Columbus, Ohio, is a "chain of 25 retail stores that sells name brand and designer brand goods at off-brand prices." (Defs.' Statement of Material Facts as to Which There Are Genuine Disputes, dated Apr. 15, 2009 ("Def. Supp'l 56.1"), ¶ 31; Pls.' Resp. to Defs.' Statement of Material Facts as to Which Defs. Claim There Are Genuine

Disputes, dated Aug. 11, 2009 ("Pl. Supp'l 56.1"), ¶ 31; see also Pl. 56.1 ¶¶ 8–9; Def. 56.1 ¶¶ 8–9.) From December 2004 to April 2009, Filene's was a wholly-owned subsidiary of Retail Ventures. (See Decl. of Julia A. Davis, dated Apr. 10, 2009 ("Davis Decl"), ¶¶ 1–2.) On April 21, 2009, Retail Ventures "sold all of the outstanding capital stock of Filene's ... to FB II Acquisition Corp., a newly formed entity owned by Buxbaum Holdings, Inc." (SEC Form 10–K for the Fiscal Year Ended Jan. 31, 2009, filed by Retail Ventures, Inc., dated Apr. 29, 2009, at 6.)

Anthony Cannatella ("Cannatella"), formerly an attorney with the firm Pavia & Harcourt LLP, sent Filene's a cease and desist letter on behalf of Fendi, dated July 12, 2001, stating that "[i]t has come to [Fendi's] attention that [Filene's] is offering for sale and selling counterfeit FENDI handbags and accessories in a number of its locations" and that Fendi "demands that Filene's immediately cease and desist from further sale and distribution of any counterfeit FENDI merchandise." (Genecin Decl. Ex. 10 (Letter from Anthony S. Cannatella, Esq. to Judy Barr, Filene's Basement, Inc. & Filene's Basement, Inc. Corporate Office, dated July 12, 2001 ("Cease and Desist Letter")), at 1–2.) Ashley Reed Trading, Inc. ("Ashley Reed") "was the source of the counterfeit goods to Filene's" that were referenced in the Cease and Desist Letter. (Decl. of Jamie Stockton, dated Apr. 20, 2009 ("Stockton Decl"), Ex. 3 (Dep. of Anthony Cannatella, dated Dec. 10, 2007 ("Defs. Cannatella Dep. Excerpts")), at 22:16–23; see also Pl. 56.1 ¶ 155; Def. 56.1 ¶ 155.) [3]

Judith Barr ("Barr"), the then-general manager of the Filene's store in Chelsea,

---

**3.** On February 16, 2010, in another litigation pending before this Court, the Court granted Fendi's motion for summary judgment in part as to trademark counterfeiting, trademark dilution, and common law unfair competition claims against Ashley Reed—Filene's principal source for Fendi-branded goods, (see Pl. 56.1 ¶ 124; Def. 56.1 ¶ 124)—and Ashley Reed's owners and officers, Scott Ressler and James Ressler. See Fendi Adele S.R.L. v. Ashley Reed Trading, Inc., No. 06 Civ. 243, 2010

New York City ("Chelsea Store"), received the Cease and Desist Letter and faxed it to James Rudd, Filene's Executive Vice President of Stores and Operations ("Rudd"). (See Pl. 56.1 ¶ 156; Def. 56.1 ¶ 156.) Barr was "instructed to take all Fendi handbags off the floor" and to "send the Fendi[-]branded handbags to Fendi's lawyers' offices." (Pl. 56.1 ¶¶ 157–58; Def. 56.1 ¶¶ 157–58.) Barr testified that she sent two Fendi-branded handbags to Fendi's counsel. (See Barr Dep. at 19:13–16, 19:20–25, 21:16–22.)

On July 20, 2001, counsel for Value City Department Stores, Inc., Filene's parent company at the time, (see Pl. 56.1 ¶ 159; Def. 56.1 ¶ 159), represented to Fendi's counsel that "the Fendi handbags are being pulled from all Filene's Basement Stores." (Genecin Decl. Ex. 11 (Letter from Irwin A. Bain, Esq. to Anthony S. Cannatella, Esq., dated July 20, 2001); see also Pl. 56.1 ¶ 160; Def. 56.1 ¶ 160.)

Approximately a week after receiving the Cease and Desist Letter, the Chelsea Store received a shipment of approximately twelve pairs of Fendi-branded shoes. See Pl. 56.1 ¶ 163; Def. 56.1 ¶ 163; see also Stockton Decl. Ex. 9 (Dep. of Judith Barr, dated Dec. 13, 2007 ("Defs. Barr Dep. Excerpts"), at 41:4–6.) Barr sought guidance from Rudd and was instructed to send one pair of these shoes to Fendi's counsel. (See Def. Supp'l 56.1 ¶ 8; Pl. Supp'l 56.1 ¶ 8; see also Defs. Barr. Dep. Excerpts at 41:7–9.) "Fendi had the shoes examined and determined that they were genuine." (Def. Supp'l 56.1 ¶ 8; Pl. Supp'l 56.1 ¶ 8.)

Barr testified that, starting in 2002, she never again questioned whether Filene's should be selling Fendi handbags. (See Genecin Decl. Ex. 35 (Dep. of Judith Barr, dated Dec. 13, 2007 ("Pls. Barr Dep. Excerpts")), at 59:2–60:17 ("Q. So you knew in July of 2001 that Filene's Basement was allegedly selling counterfeit trademark handbags; is that right? A. According to [the Cease and Desist Letter], yes. . . . Q. After that, you weren't told anything about what happened with the handbags; is that right? A. Right, that is correct. Q. After that, the stores where you were manager sold Fendi trademark handbags; is that right? A. Appears to be so, yes. Q. But after that, you'd never again raised a question about whether those stores were supposed to have those handbags; is that right? A. That's correct.").)

In 2003, representatives of Filene's met with representatives of Ashley Reed at least twice regarding additional purchases from Ashley Reed of Fendi-branded goods. (See Genecin Decl. Ex. 30 (Dep. of Heywood Wilansky, dated Oct. 23, 2007 ("Pls. Wilansky Dep. Excerpts")), at 101:10–16; Ex. 31 (Dep. of Cynthia Quinn, dated Aug. 2, 2007 ("Pls. Quinn Dep. Excerpts.")), at 28:17–20.) Cynthia Quinn, Vice President and Divisional Merchandise Manager of Filene's ("Quinn"), testified that Ashley Reed's principal, James Ressler, claimed during these meetings that Ashley Reed obtained Fendi-branded goods from "Fendi factories" in Italy, from "the manufacturer," and from store stock in Italy. (Stockton Decl. Ex. 7 (Dep. of Cynthia A. Quinn, dated Aug. 2, 2007 ("Defs. Quinn Dep. Excerpts")), at 154:8–155:3 ("Q. [W]hat did he say to you about where he got the bags? . . . A. Through factories in Italy and store stock. . . . Q. And did he say that it was specifically those two

WL 571804, at *12–13, 2010 U.S. Dist. LEXIS 13934, at *37–38 (S.D.N.Y. Feb. 16, 2010) ("Minerva examined 15 Fendi[-]branded handbags and small leather items that had either been sold by Filene's Basement or that were obtained from that defendant during discovery . . . [and] determined them to be counterfeit. Plaintiffs [i.e., Fendi] met their burden to show the absence of a genuine issue of material fact as to Defendants' liability [for counterfeiting Fendi-branded goods].").

sources, or was it one or the other or maybe both? A. Both."); *see also* Pl. 56.1 ¶¶ 188–89; Def. 56.1 ¶¶ 188–89.) Ashley Reed neither identified to Filene's any specific factories or stores from which Ashley Reed allegedly obtained Fendi-branded goods nor provided Filene's with any documents to substantiate the representations made by James Ressler concerning Ashley Reed's sources of Fendi-branded goods. (*See* Defs. Quinn Dep. Excerpts at 155:6–12 ("Q. Did he tell you which stores? A. No, he didn't tell me the stores. Q. Did he tell you which factories? A. No, he did not. Q. So you don't know whether it was Fendi factories or not? A. In my mind, it was Fendi factories."), 68:9–11 ("Q. Were you shown any documents by Mr. Ressler to prove what he was saying to you? A. No.").)

During Filene's second meeting with representatives of Ashley Reed, Filene's President and Chief Executive Officer Heywood Wilansky ("Wilansky") asked James Ressler to sign a form agreement relating to Ashley Reed's sale of Fendi-branded goods to Filene's. (*See* Pl. 56.1 ¶ 187; Def. 56.1 ¶ 187; Defs. Quinn Dep. Excerpts at 68:12–15 ("Q. And it was at this second meeting that Mr. Wilansky said, 'You're going to need to sign a letter for us'; is that right? A. Right.").) James Ressler signed a Purchase Order–Specific Agreement, dated June 12, 2003, on behalf of Ashley Reed. (*See* Pl. 56.1 ¶ 199; Def. 56.1 ¶ 199.) The agreement omits a (redacted) paragraph (¶ 2) that, prior to its redaction, read: "Seller has the legal right to sell the Merchandise, including sale thereof for resale in the U.S.A., and the purchase and resale of the Merchandise by Filene's in the U.S.A. will not violate or infringe upon any existing contractual and/or Proprietary Rights owned by others."[4] (Pl. 56.1 ¶¶ 206–08; Def. 56.1 ¶¶ 206–08.) "Under his signature on the 'Purchase Order[-]Specific Agreement,' J[ames] Ressler wrote that 'Point 2 [legal right to sell] was taken out.'" (Pl. 56.1 ¶ 207; Def. 56.1 ¶ 207.)

Beginning in 2003, Filene's purchased additional Fendi-branded handbags and wallets from Ashley Reed. (*See* Def. Supp'l 56.1 ¶ 17; Pl. Supp'l 56.1 ¶ 17.) Quinn testified that Filene's did not take any steps to confirm the genuineness of the Fendi-branded goods from Ashley Reed after James Ressler returned the (redacted) agreement to Filene's. (*See* Defs. Quinn Dep. Excerpts at 144:10–18 ("Q. [H]aving Mr. Ressler sign that letter, was that the only step that anybody in the company took to be sure that it was buying genuine goods from Mr. Ressler? A. Yes. Q. And based on that letter, you felt that was sufficient to give you confidence that you were not purchasing counterfeit goods? A. Yes.").)

In or about 2005, Fendi's counsel purchased Fendi-branded goods from Filene's. (*See* Defs. Cannatella Dep. Excerpts at 88:18–89:7, 89:21–25 ("Q. [W]hy was a purchase made in 2005 of a handbag from Filene's, what prompted that purchase by Fendi? A. . . . Fendi [-]branded merchandise was being sold by Filene's Basement[, which] is not a customer of Fendi. And [we learned] that Ashley Reed was selling to Filene's Basement[.]").) A subsequent analysis of these goods in Italy determined that they were counterfeit. (*See* Defs. Cannatella Dep. Excerpts at 88:18–89:7, 89:21–25.)

---

4. *See also* Hr'g Tr. at 13:3–18 ("THE COURT: Anyone would think that the blacking out of the language [regarding legal right to sell] is significant. . . . [T]hat's a pretty unusual black out for a buyer to enter into an agreement with the seller and the seller says I'm not warranting that I have the legal right to sell this to you. That's pretty extraordinary, don't you think? . . . Would you buy a car from somebody if your agreement of sale had that provision blacked out? I don't think you would. MR. REMAKLUS: It depends.").

On or about December 21, 2005, Fendi sent another cease and desist letter to Filene's demanding that it cease sales of counterfeit Fendi-branded handbags and small leather items. (*See* Pl. 56.1 ¶ 213; Def. 56.1 ¶ 213; *see also* Stockton Decl. Ex. 19 (Letter from Anthony S. Cannatella, Esq. to Julie A. Davis, Esq., Filene's Basement, dated Dec, 21, 2005) ("It has come to our attention that Filene's ... is offering for sale and selling counterfeit FENDI handbags, small leather goods and accessories at its retail locations. FENDI-branded merchandise currently offered for sale by Filene's ... has been specifically identified as counterfeit. FENDI hereby demands that Filene's ... cease and desist any and all importation, manufacture ..., offering for sale, sale, distribution, advertising, promotion and display of counterfeit FENDI-branded handbags, small leather goods, and accessories.") (emphasis omitted).)

Leonardo Minerva, Industrial Director of Leather Goods and Logistics Director for Fendi S.r.l. ("Minerva"), was "in charge of all manufacture by Fendi S.r.l. of Products from September, 2002 until March, 2008." (Pl. 56.1 ¶ 104; Def. 56.1 ¶ 104.) Minerva examined fifteen (15) Fendi-branded handbags and wallets that were obtained by Fendi from Filene's (collectively, "Examined Items").[5] (*See* Pl. 56.1 ¶¶ 116, 118; Def. 56.1 ¶ 118.) Minerva testified that he had conducted authenticity examinations for each of the fifteen Examined Items and had determined them all to be counterfeit. (*See* Genecin Decl. Ex. 22 (Dep. of Leonardo Minerva, dated Feb. 13, 2008 ("Minerva Dep.")), at 200:5–203:18 ("Q. What was [your] conclusion? A. **That this item** [Plaintiffs' Exhibit 78] **is counterfeit because it was not produced by Fendi**. Q. And what are your reasons for concluding that this item is counterfeit? A. [T]his item was never produced in the season that is stamped here ... 038 ... in this model with this trim of leather with this color[.][It] is very, very obvious [that] the quality of the leather ... is very low grade. Plus ... the lining is different from ours, and the code shows up [as] assembler 2289[;] that [assembler] never produced this wallet in this season with this material in this color.") (emphasis added), 209:21–212:13 ("Q. [W]hat are your reasons for concluding that this item [Plaintiffs' Exhibit 82] is counterfeit? A. First of all, this model has never been made in this combination of color and fabric materials, plus this fabric is out of style in terms of color and dimension.... [T]he lining is not our lining[.] ... [T]he metal plate inside there, it's a big one instead of the small one.... [T]his zipper pull is another material than the original one in this period.... [T]he code of the assembler is missing[.]"), 203:19–209:20, 212:14–219:9, 235:8–237:19 ("[T]his bag was not made by Fendi, therefore it is a counterfeit."), 237:20–254:8; *see* also Pl. 56.1 ¶¶ 121–22.)[6]

Minerva did not examine certain additional Fendi-branded merchandise that

---

**5.** "Plaintiffs' Exhibit 78, a Fendi[-]branded wallet, was purchased by Fendi's investigator at the Filene's Basement store located at 620 Sixth Avenue, New York, NY" and "Plaintiffs' Exhibits 79 through 92 were selected on April 12, 2007 at Filene's Basement's distribution center in Auburn, Massachusetts from the inventory of Fendi[-]branded goods removed by [Filene's] from sale in response to [P]laintiffs' December 21, 2005 cease-and-desist letter." (Decl. of Joseph Parilla, dated Feb. 27, 2009 ("Parilla Decl."), ¶¶ 2–3.) "Plaintiffs' Exhib-

its 79 through 92 constitute one sample each of ... the fourteen SKUs [*i.e.*, Stock Keeping Units] that had the largest number of individual items present in [Filene's] inventory." (Pl. 56.1 ¶ 120; Def. 56.1 ¶ 120.)

**6.** Minerva also testified that, under his supervision, his assistant, Massimo Lepri, prepared a written report for each of the fifteen Examined Items ("Authenticity Reports"). (*See* Minerva Dep. at 492:7–15 ("These reports are part of a consolidated process whereby [they]

Fendi asserts is counterfeit. (*See* Pl. Mem. at 4.) This merchandise was purchased by Filene's from two other sources: Bungar C.S.C, an Armenian company, by way of an importer, Value City Imports; and from Summit Resource Imports LLC. (*See* Pl. Mem. at 4; Pl. Supp'l 56.1 ¶¶ 19–20; Pls. Quinn Dep. Excerpts at 217:17–25; Genecin Decl. Exs. 15–16, 19–21 (Invoices and Purchase Orders).)

Glenn Newman, who Filene's retained as an expert witness, concluded that Filene's has "approximately 123 units of allegedly infringing [Fendi-branded] product in inventory." (Decl. of Glenn Newman, dated Apr. 2, 2009 ("Newman Decl."), Ex. 1 (Expert Report of Glenn Newman, dated Oct. 15, 2008), at 7.)

### Retail Ventures

On April 10, 2009, Julia Davis, the Executive Vice President, General Counsel, and Assistant Secretary of Retail Ventures, who since January 1, 2003 also served as General Counsel for Filene's, stated that "[a]s a holding company, Retail Ventures literally operates no retail, wholesale or other stores, does not purchase goods or import goods for resale, and is instead responsible only for various corporate functions, assets, liabilities, and expenses that are not allocated to [Retail Ventures' subsidiaries]"; that "Retail Ventures and Filene's . . . each follow all corporate formalities"; that Retail Ventures and Filene's "maintain separate corporate records, they hold separate meetings of their respective boards of directors, and they pay separate taxes"; that "[a]lthough Retail Ventures and Filene's have some common directors and officers, they do not have identical directors and officers"; that "Filene's . . . is operated separately from Retail Ventures, and Filene's . . . is solely responsible for all operations of its now 25 operating retail stores, its corporate offices, and its warehouse"; and that while "Retail Ventures and the various companies that it owns, including Filene's[,] do use common sources for certain corporate services . . . each entity's share of the costs for those services is allocated to that entity." (Davis Decl. ¶¶ 1–9, 12–14.)

At the same time, between 2003 and 2008, Retail Ventures represented repeatedly in certain of its SEC filings that Retail Ventures "operate[d]" Filene's stores and that certain "key support services" (*e.g.*, finance and accounting, human resources and administration, and legal) for Retail Ventures' subsidiaries would be "centraliz[ed.]" [7] Jeffrey Feinberg, Vice

---

are prepared by Mr. Massimo Lepri under my supervision."), 495:4–8 ("All of the reports were checked by me."); *see also* Pl. 56.1 ¶ 115; Def. 56.1 ¶ 115.)

7. *See* Decl. of Victor Genecin, dated Aug. 11, 2009 ("Genecin Supp'l Decl."), Ex. 37 (SEC Form 8–K, filed by Retail Ventures, Inc., dated Oct. 7, 2003) ("[O]ur new holding company structure and corporate name [Retail Ventures Inc.] better suit the retailing company we are today. [Retail Ventures] operates a strong portfolio of operating companies that bracket the off-price retail segment. . . . Retail Ventures . . . currently operates 116 Value City Department Stores, 21 Filene's Basement stores, and 135 DSW stores."); Ex. 38 (SEC Form 8–K, filed by Retail Ventures, Inc., dated July 29, 2004); Ex. 39 (SEC Form 8–K,

filed by Retail Ventures, Inc., dated July 5, 2005) ("Retail Ventures . . . is a leading off-price retailer currently operating . . . 27 Filene's Basement Stores . . ."); Ex. 40 (SEC Form 8–K, filed by Retail Ventures, Inc., dated June 7, 2006); Ex. 41 (SEC Form 10–K for the Fiscal Year Ended Feb. 2, 2008, filed by Retail Ventures, Inc., dated Apr. 24, 2008), at 6 ("We operate our business in the three segments described below: [including] Filene's Basement.") (emphasis omitted), 13 ("Our ability to open and operate new . . . Filene's Basement stores successfully on a timely and profitable basis depends on many factors . . . ."); Ex. 42 (SEC Form 8–K, filed by Retail Ventures, Inc., dated Jan. 23, 2008) ("Retail Ventures . . . continues to operate 36 Filene's Basement stores . . . and 259 DSW stores . . . .").

President and Controller of Filene's ("Feinberg"), testified that Retail Ventures Services, Inc. ("Retail Ventures Services") provided Retail Ventures' subsidiaries with support services. (*See* Genecin Supp'l Decl. Ex. 45 (Dep. of Jeffrey Feinberg, dated Aug. 7, 2007 ("Feinberg Dep.")), at 7:16–8:10 ("Q. What exactly is Retail Ventures Services . . . ? A. It is the company that all the Retail Ventures Services support employees work for. Q. And the Retail Ventures support employees, what are the activities that they support? A. Financial activities, IT activities, HR activities, warehousing and transportation activities[,] executive positions. . . . Q. And these activities, for what company or companies are these activities performed? A. For Filene's Basement . . . .").) Indeed, even though he is Controller of Filene's, Feinberg does not report to the president of Filene's. (Feinberg Dep. at 14:15–15:19.) Rather, he reports to the senior vice president of finance for Retail Ventures Services, who reports to the chief financial officer for Retail Ventures Services, who in turn reports to the chief executive officer of Retail Ventures. (Feinberg Dep. at 14:15–15:19.)

### Sanctions Against Defendants

On March 24, 2009, United States Magistrate Judge Michael H. Dolinger issued an order granting in part and denying in part a motion for sanctions against Defendants, dated November 17, 2008, filed by Fendi. (Mem. & Order [# 99], dated Mar. 24, 2009, 2009 WL 855955 ("Sanctions Order").) Judge Dolinger determined that "the required expenditure of funds [by Fendi] to pursue withheld discovery [from Defendants] is prejudice enough to justify cost-shifting[.]" (Sanctions Order at 21.) He also found that Defendants exhibited an "evident pattern of non-production of documents, coupled with false assurances that [Defendants] had produced all of [their] documents"; that Defendants "initial production of a handful of docu-ments—notably bare of some of the most basic documents that a company of the size and sophistication of Filene's would un-questionably maintain—was manifestly in-adequate and the representation that there were no more documents was absurd on its face"; that "[t]he process of extracting those records was akin to pulling teeth, and ultimately consumed a plainly unrea-sonable amount of time to accomplish"; and that "it appears the company [*i.e.*, Filene's] made less than vigorous efforts to ensure that people with knowledge of, or access to, the potentially pertinent docu-ments were given specific instructions to search for the categories of documents re-quested by [Fendi]." (Sanctions Order at 18–19.) On January 29, 2010, this Court entered an order affirming the Sanctions Order. (Order [# 145], dated Jan. 29, 2010.) Although the parties have made submissions concerning the specific amount of sanctions to be awarded, Judge Dolinger has not yet quantified the award of sanctions.

### III. Legal Standard

"Summary judgment is appropriate when 'the pleadings, the discovery and dis-closure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Chloé v. DesignersImports.com USA, Inc.*, No. 07 Civ. 1791, 2009 WL 1227927, at *4 (S.D.N.Y. Apr. 30, 2009) (quoting Fed. R.Civ.P. 56(c)). "The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact." *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781, 2009 WL 1675080, at *3 (S.D.N.Y. June 10, 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "A party opposing a properly made motion for summary judgment 'may not rely merely on allegations or denials in its own plead-ing; rather, its response must-by affidavits

or as otherwise provided in [Fed.R.Civ.P. 56]—set out specific facts showing a genuine issue for trial.'" *DesignersImports.com USA*, 2009 WL 1227927, at *5 (quoting Fed.R.Civ.P. 56(e)). "When deciding a summary judgment motion, a court must construe all the evidence in the light most favorable to the nonmoving party ... and draw all inferences and resolve all ambiguities in that party's favor." *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 Fed. Appx. 615, 617 (2d Cir.2008).

Where, as here, cross-motions for summary judgment are made, the standard is the same as that for individual motions for summary judgment. *See Morales v. Quintel Entm't*, 249 F.3d 115, 121 (2d Cir.2001).

 In order to obtain a permanent injunction on a Lanham Act claim, "a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *L. & J.G. Stickley, Inc. v. Cosser*, 255 Fed.Appx. 541, 543 (2d Cir. 2007) (quoting *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir.2006)). "In trademark disputes, 'a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.'" *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir.2005) (quoting *Hasbro, Inc. v. Lanard Toys. Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988)); *see also In re Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir.1979).

## IV. Analysis

### (1) Affirmative Defenses

#### *Acquiescence*

Plaintiffs argue (persuasively) that "Defendants cannot sustain their heavy bur-

den of demonstrating that Fendi actively consented to the infringing use of the Fendi trademarks." (Pl. Mem. at 23.) Defendants counter that "there are genuine issues as to whether Fendi's claims should be barred, in whole or in part" because Fendi "never reported back to Filene's with the results of its examination" of two sample handbags that Filene's asserts it provided to Fendi in 2001. (Def. Mem. at 2.)[8]

 "Acquiescence is implied by active consent, which is 'conduct on the plaintiff's part that amount[s] to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant.'" *Info. Superhighway, Inc. v. Talk Am., Inc.*, 274 F.Supp.2d 466, 472 (S.D.N.Y. 2003) (quoting *ProFitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir.2002)). A defendant has the burden of proof on his affirmative defense of acquiescence. *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F.Supp.2d 126, 135 (S.D.N.Y.1999).

 Plaintiffs are entitled to summary judgment as to acquiescence because, among other reasons, Defendants fail to adduce any evidence that Plaintiffs made assurances that Plaintiffs would not assert their rights in the Fendi Marks against Defendants. *See Gidatex*, 82 F.Supp.2d at 135; *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 704 (2d Cir.1970). Indeed, Defendants specifically acknowledge that Plaintiffs sent Filene's a cease and desist letter in 2001 alleging that Filene's is "offering for sale and selling counterfeit FENDI handbags and accesso-

---

**8.** Defendants assert that Filene's sent two Fendi-branded handbags to Fendi's counsel in 2001 and "[f]or more than four years thereafter, neither Fendi's counsel, nor anyone else on behalf of Fendi, ever contacted Filene's

regarding the two Fendi-branded handbags ... provided for inspection in July, 2001." (*See* Barr Dep. at 19:13–16, 19:20–25, 21:16–22; Def. Supp'l 56.1 ¶ 11.)

ries." (Genecin Deck Ex. 10; *see also* pp. 373–74, *supra;* Pls. Barr Dep. Excerpts at 59:2–60:17 ("Q. So you knew in July of 2001 that Filene's Basement was allegedly selling counterfeit trademark handbags; is that right? A. According to the [Cease and Desist Letter], yes.").)[9] Even assuming Fendi did not contact Filene's until 2005 after receiving sample merchandise from Filene's, as Defendants assert, "silence is far from 'active acquiescence.'" *Deere & Co. v. MTD Holdings, Inc.*, No. 00 Civ. 5936, 2004 WL 324890, at *22, 2004 U.S. Dist. LEXIS 2550, at *68 (S.D.N.Y. Feb. 19, 2004).

### Laches

Plaintiffs argue (persuasively) that Defendants cannot meet their burden to establish laches because, among other reasons, Plaintiffs filed the instant action within the applicable statute of limitations which provides the "benchmark for determining issues of laches." (Pl. Mem. at 24.) Plaintiffs also contend that the Cease and Desist Letter their counsel sent to Filene's in 2001 "obviates a claim of laches." (Pl. Mem. at 24.) Defendants counter that there are genuine issues as to whether Fendi's claims should be barred, in whole or in part, by laches because Fendi "never reported back to Filene's with the results of its examination" of the sample handbag(s) that Filene's asserts it provided to Fendi in 2001. (Def. Mem. at 2.)

■ "[P]rior to the running of the most closely analogous state statute of limitations[,] there is no presumption of laches and the burden remains on the defendant to prove the defense." *Conopco*, 95 F.3d at 191. "In evaluating whether [a] plain-tiff's delay in taking action was sufficiently long to invoke laches in a Lanham Act suit, the Second Circuit has held that the six-year statute of limitations applicable to state-law fraud claims in New York is the appropriate measure." *Fitzpatrick v. Sony–BMG Music Entm't, Inc.*, No. 07 Civ. 2933, 2008 WL 84541, at *2 (S.D.N.Y. Jan. 8, 2008) (citing *Conopco*, 95 F.3d at 191–92). "In order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action." *Conopco*, 95 F.3d at 192.

■ Plaintiffs are entitled to summary judgment as to laches because, among other reasons, Plaintiffs initiated this suit within the applicable six-year period of limitations. *See Fitzpatrick*, 2008 WL 84541, at *2 ("Prior to the running of the [six-year statute of limitations period] there is no presumption of laches ...." (citation omitted and alteration in original)). Defendants adduce no evidence that Plaintiffs unreasonably delayed in bringing suit or that Defendants were prejudiced. *See Road Dawgs*, 2009 WL 5185809, at *14; *Gidatex*, 82 F.Supp.2d at 134; *see also Carl Zeiss*, 433 F.2d at 703. And, in light of the Cease and Desist Letter sent to Filene's in 2001, Defendants were clearly on notice of Plaintiffs' objections to any sales by Defendants of counterfeit Fendi-branded goods. (*See* pp. 373–74, *supra*); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1041 (2d Cir.1980); *see also Elvis Presley Enters. v. Capece*, 141 F.3d 188, 205 (5th Cir.1998) ("Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such

---

**9.** And, Defendants have not shown any prejudice because of any delay by Plaintiffs in asserting their rights. *See Road Dawgs Motorcycle Club of U.S., Inc. v. "Cuse" Road Dawgs, Inc.*, No. 05 Civ. 966, 2009 WL 5185809, at *13 (N.D.N.Y. Dec. 22, 2009); *see also Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir.1996) ("A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim.").

acts."); *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F.Supp.2d 622, 634 (N.D.Tex.2009).

### *Other Affirmative Defenses*

Plaintiffs are also entitled to summary judgment as to the affirmative defense of estoppel, (*see* Answer ¶ 99), because Defendants appear to have abandoned that defense by failing to oppose summary judgment in their opposition to Plaintiffs' motion. (*See* Def. Mem. at 1–2 (arguing only that "Defendants have valid affirmative defenses of laches and acquiescence"); Pl. Mem. at 25); *see also Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc.*, No. 07 Civ. 3662, 2009 WL 2997382, at *9 (E.D.N.Y. Sept. 15, 2009) ("As a result of defendants' failure to oppose plaintiffs' motion as to their defenses ... the court finds that the defendants abandoned their affirmative defenses ...."); *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003). And, on January 16, 2009, Defendants withdrew their unclean hands defense. (*See* Letter from Kenneth A. Plevan, Esq. to Hon. Richard M. Berman, dated Jan. 16, 2009, at 2 ("Filene's will withdraw its affirmative defense of unclean hands.").)

### (2) **Plaintiffs' Claims of Trademark Counterfeiting and False Designation of Origin Under the Lanham Act**

■ Preliminarily, Defendants contest (unpersuasively) the admissibility of Minerva's testimony that the Examined Items are "counterfeit" arguing, among other things, that Minerva: (1) "had no independent personal knowledge or recollection of any of the product examinations" and (2) "simply read his answers from inadmissible documents." (Def. Mem. at 3.) Plaintiffs counter, among other things, that: (1) Minerva unquestionably had the requisite knowledge because the examinations of the Examined Items were "conducted under his direct supervision"; and (2) Minerva's testimony included "numerous observations concerning counterfeit characteristics of the exhibits he was shown." [10] (Pl. Reply at 7–13.)

Minerva's testimony is admissible under Fed.R.Evid. 701.[11] *See M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, No. 98 Civ. 99, 2008 WL 4412093, at *2–3 (W.D.N.Y. Sept. 23, 2008). For one thing, Minerva's opinions are rationally based on his perceptions. *See Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir.2004) ("to the extent Huang's testimony was ground-

---

**10.** Minerva, who was Industrial Director of Leather Goods and Logistics Director for Fendi S.r.l and "in charge of [its] manufacture ... of Products from September, 2002 until March, 2008," testified at his depositions as a lay witness. (Pl. 56.1 ¶ 104; Def. 56.1 ¶ 104; *see also* pp. 376–77, *supra;* Minerva Dep. at 12:9–13:11.) Minerva's responsibilities included "all development of leather goods, all the research of the material, the development of the models, the sample collection that goes to the fashion show, the purchasing of all the material, the production of all the leather goods, [and] the distribution of these leather goods to [Fendi's] distribution center." (Minerva Dep. at 11:16–12:4; *see also* Minerva Dep. at 12:9–13:11 ("Q. Do you have responsibility for examining products that look like

Fendi products, but their authenticity is questioned? A. Yes. Q. And for how long have you been doing that work? A. After ... the one-year training, ... four years and a half." "Q. ... [H]ow many questioned products have you examined in your career at Fendi? A. Hundreds, hundreds a year.").)

**11.** Rule 701 of the Federal Rules of Evidence ("Fed.R.Evid.") allows a lay witness to testify to "opinions or inferences which are[:] (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701.

ed in the investigation he undertook in his role as a Bank of China employee, it was admissible pursuant to [Fed.R.Evid.] 701 ... because it was based on his *perceptions*") (emphasis in original); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir.1993). In his role as Industrial Director of Leather Goods and Logistics Director for Fendi, Minerva independently inspected each Examined Item for indicia of counterfeiting, and supervised the preparation of the Authenticity Reports. (*See* Minerva Dep. at 406:12–407:15, 492:7–15, 495:4–8, 495:13–17.) Second, Minerva's testimony is helpful to determining the genuineness of the Examined Items. *See M.O.C.H.A. Soc'y*, 2008 WL 4412093, at *2. Third, Minerva's testimony is admitted "because of the particularized knowledge that the witness has by virtue of his ... position in the business." *Bank of China*, 359 F.3d at 181 (citing Fed.R.Evid. 701 advisory committee's note); *see also United States v. Rigas*, 490 F.3d 208, 224 (2d Cir.2007).

Minerva's testimony is admissible notwithstanding that he may have relied at times on the Authenticity Reports to refresh his recollection. (*See* Minerva Dep. at 12:9–13:11); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F.Supp.2d 585, 594, 2010 WL 431509, at *5 (S.D.N.Y.2010) ("Minerva was entitled to consult the reports throughout his testimony. Courts have permitted witnesses to rely on notes or documents throughout the course of testimony if the witness demonstrates an independent recollection, and the testimony is of a detailed nature."); *see also Goings v. United States*, 377 F.2d 753, 761 n. 11 (8th Cir. 1967).[12]

### Trademark Counterfeiting and False Designation of Origin

#### Filene's

Plaintiffs argue, among other things, that "[t]he Fendi trademarks are ... valid and entitled to protection" and that Filene's "use in commerce of counterfeits of the Fendi trademarks is shown by uncontroverted evidence." (Pl. Mem. at 6–8.) Filene's counters, among other things, that "significant evidence show[s] that genuine Fendi merchandise is often available in grey market channels" and that "Fendi has not offered any direct evidence regarding the Bungar and Summit items." (Def. Mem. at 2–3; *see also* pp. 376–77, *supra*.)

■ Section 32(1) of the Lanham Act prohibits "the use in commerce of 'any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.'" *Yurman Studio, Inc. v. Castaneda*, 591 F.Supp.2d 471, 486 (S.D.N.Y.2008) (quoting 15 U.S.C. § 1114(1)). "A claim of trademark infringement, whether brought under 15 U.S.C. § 1114(1) (for infringement of a

---

12. *See Bankers Trust Co. v. Publicker Indus., Inc.*, 641 F.2d 1361, 1363 (2d Cir.1981) ("There is no required, ritualistic formula for finding exhaustion of memory." (citing *Goings*, 377 F.2d at 760–61)). It cannot be concluded, as Defendants suggest, that Minerva "simply read his answers from" the Authenticity Reports because, among other reasons, at times while testifying Minerva compared Examined Items to genuine Fendi merchandise and then specified deficiencies he observed in the Examined Items during those comparisons. (*See* Minerva Dep. at 208:7–209:20); *see also Fendi Adele S.R.L.*, 689 F.Supp.2d at 595, 2010 WL 431509, at *5 ("Given the fact that Minerva did not rely exclusively on the reports and that the nature of the testimony was detailed, we find his use of the reports was proper.").

registered mark) or 15 U.S.C. § 1125(a) (for infringement of rights in a mark acquired by use), is analyzed ... [by looking] first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1074 (2d Cir.1993)). To determine whether there is a likelihood of confusion, courts in the Second Circuit generally rely on the eight-factor test set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495–96 (2d Cir.1961). *See Burberry,* 2009 WL 1675080, at *5. "However ... where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Id.* (quoting *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,* 378 F.Supp.2d 448, 454–55 (S.D.N.Y.2005)); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 287 (S.D.N.Y.2003). The court "need only determine the more fundamental question of whether there are items to be confused in the first place—that is, whether the items at issue ... are, in fact, counterfeit and whether [d]efendants sold those items," *Duty Free Apparel,* 286 F.Supp.2d at 287–88, or offered those items for sale, *see* 15 U.S.C. § 1114(1). "Sellers bear strict liability for violations of the Lanham Act." *Hard Rock Cafe Licensing Corp. v. Con-*

cession Servs., Inc., 955 F.2d 1143, 1152 n. 6 (7th Cir.1992).

■ The Fendi Marks are clearly entitled to protection because, as Filene's acknowledges, Fendi Adele S.r.l. owns the marks. (*See* Def. 56.1 ¶ 1.) Filene's has offered no evidence to rebut the presumption that the Fendi Marks are valid and enforceable as a result of registration with the USPTO. (*See* Genecin Decl. Exs. 1–5 (USPTO Certificates of Registration); pp. 379–81, *supra*); *see also* 15 U.S.C. §§ 1057(f), 1115(a); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 345 (2d Cir.1999); *Burberry,* 2009 WL 1675080, at *5. Three of the Fendi Marks are incontestable because Plaintiffs continuously used them for at least five years after registering the Marks with the USPTO and prior to commencing this action.[13] (*See* Genecin Decl. Exs. 1–3 (USPTO Certificates of Registration)); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,* 277 F.Supp.2d 356, 361 (S.D.N.Y. 2003) ("[p]laintiff's registration of the relevant mark has been in place for more than five years; its entitlement to protection is therefore incontest[a]ble").

And, Filene's has not rebutted Plaintiffs' evidence that the Examined Items were counterfeit Fendi-branded goods.[14] Plaintiffs presented unrebutted testimony that the fifteen Examined Items are counterfeit and were not manufactured by Fendi. (*See* pp. 376–77, *supra;* Minerva Dep. at 201:17–18 ("This item [Plaintiffs' Exhibit 78] is counterfeit because it was not produced by Fendi."), 203:19–205:11 ("[T]his

---

**13.** The other two Fendi Marks had not been registered and in continuous use for at least five years at the time this action was filed but are presumed valid because they were registered with the USPTO. (*See* Genecin Decl. Exs. 4–5 (USPTO Certificates of Registration)); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.,* 793 F.2d 1529, 1540–41 (11th Cir.1986).

**14.** Filene's acknowledges that one of the fifteen Examined Items was sold by Filene's; and that fourteen Examined Items were offered for sale by Filene's but "removed by [Filene's] from sale in response to [P]laintiffs' December 21, 2005 cease and desist letter." (Pl. 56.1 ¶ 118; Def. 56.1 ¶ 118.)

item [Plaintiffs' Exhibit 79] is a counterfeit because it was not made by Fendi."), 210:23–24 ("This item [Plaintiffs' Exhibit 82] is a counterfeit, because it's not been produced by Fendi."), 241:19–20 ("[T]his bag [Plaintiffs' Exhibit 88] is a counterfeit because it was not made by Fendi."), 244:7–8 ("Fendi never produced this bag [Plaintiffs' Exhibit 89] ... so [it is] a counterfeit."); see also Duty Free Apparel, 286 F.Supp.2d at 288. Minerva supported his conclusion(s) that each of the fifteen Examined Items are counterfeit by identifying specific characteristics which distinguished them from genuine Fendi Products. (See pp. 376–77, supra; Minerva Dep. at 204:24–205:9) ("[W]hat are your reasons for concluding that Plaintiff[s'] Exhibit 79 ... is counterfeit? A. [T]he fabric has a darker color than the original one, the leather ... is different from the grade that we use, it's a lower grade. The lining is not the lining we use. The zipper pull is different from the one that we use in that season[.]"), 216:12–24 ("Q. [W]hat are your reasons for concluding that Plaintiff[s'] Exhibit 84 ... is counterfeit? A. The fabric has a different dimension, th[is] zipper pull is a different material from the one that should have been [used] during that period. This plate is big instead of being a smaller one. The lining is different from the one that we use. The four digit[ ] code that should identify the assembler in the Fendi bag is missing."), 238:23–240:6 ("[W]hat are your reasons for concluding that Plaintiff[s'] Exhibit 87 ... is counterfeit? A. My main reasons [are] that, first of all, this bag [has] dimensions that are different from the original model. Then the lining is not what it should be. The ... buckles here are not what they should be for this model. And the hologram is fake. The ... code that is embossed in the trim of leather 2510 doesn't refer to any of our ... assemblers."); see also Pl. 56.1 ¶¶ 121–22); Fendi Adele S.R.L., 689 F.Supp.2d at 592–

93, 594–96, 2010 WL 431509, at *3, 5–6 ("Minerva's testimony establishes a prima facie case that the goods at issue are counterfeit"); Burberry, 2009 WL 1675080, at *6 ("Jackson determined that these purported 'Burberry' items contained several significant deviations from authentic[ ] Burberry products."); Duty Free Apparel, 286 F.Supp.2d at 288.

In its effort to rebut, Filene's employs "mere speculation or conjecture" that the Examined Items were obtained on the "grey market"—i.e., from "Fendi's manufacturers," (Def. Mem. at 12); or from "the warehouse attached to Fendi's outlet store in Italy," (id.); or from "authorized Fendi retailers[,]" (id.) See Fendi Adele S.R.L., 689 F.Supp.2d at 597–98, 2010 WL 431509, at *7; see also Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir.1995) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.") (quotation and citation omitted); Martal Cosmetics, Ltd. v. Int'l Beauty Exch. Inc., No. 01 Civ. 7595, 2007 WL 895697, at *21 (E.D.N.Y. Mar. 22, 2007) ("Defendants seek to rely [on] no[ ] more than mere speculation and conjecture.... [T]here is no genuine dispute of material fact as to whether the seized goods were counterfeit.") (quotation and citation omitted). Filene's provides no evidence that the "grey market" was the source of the fifteen Examined Items. See Fendi Adele S.R.L., 689 F.Supp.2d at 597, 2010 WL 431509, at *7 ("Burlington has not offered a countervailing expert, evidence that any of the goods in question were purchased from an authorized Fendi customer, or any other affirmative evidence that the bags are genuine.").

▮▮▮ And, Filene's offer of proof that it had purchased some genuine Fendi-branded goods in the past from sources includ-

ing Migosa Enterprises, Inc., a New York company, fails to raise an issue of fact concerning the authenticity of the fifteen Examined Items. (*See, e.g.,* Pl. 56.1 ¶ 126 ("Filene's ... disclosed in discovery that it purchased Fendi branded goods from ... Migosa Enterprises, Inc. .... [which] Plaintiffs do not allege ... were counterfeit"); Def. Supp'l 56.1 ¶ 8 ("Fendi had the shoes [sent by Filene's] examined and determined that they were genuine.")); *see also Fendi Adele S.R.L.,* 689 F.Supp.2d at 597, 2010 WL 431509, at *7 ("Burlington's prior purchase of authentic goods has no bearing on Minerva's determination that the goods he inspected were counterfeit."); *Duty Free Apparel,* 286 F.Supp.2d at 289.[15]

Accordingly, Plaintiffs are entitled to summary judgment on their claims against Filene's of trademark infringement under 15 U.S.C. § 1114(1) and false designation of origin under 15 U.S.C. § 1125(a). *See Burberry,* 2009 WL 1675080, at *7–8; *Fendi S.a.s. Di Paola Fendi e Sorelle v. Cosmetic World, Ltd.,* 642 F.Supp. 1143, 1145 (S.D.N.Y.1986) ("Plaintiff has established that defendant[ ], in violation of 15 U.S.C. § 1051 *et seq.,* actively engaged in the sale of goods bearing counterfeit FENDI and FF trademarks.").[16]

**Retail Ventures**

Plaintiff argues that: (i) the testimony of Retail Ventures' own employees clearly supports Retail Ventures' "joint involvement with Filene's in sales of counterfeit Fendi products"; and (ii) "RVI and Filene's operated as a single economic entity and an overall element of injustice or unfairness is present." (Pl. Reply at 6–7.) Retail Ventures counters, among other things, that: (i) the record does not support Fendi's assertion that Retail Ventures acted as a joint tortfeasor; and (ii) Retail Ventures and Filene's "certainly did not operate as a single economic entity" nor was there "fraud, or something like it" in the use of the corporate form by Retail Ventures and Filene's. (*See* RVI Reply at 9–10.)

"There are two main theories under which a parent may be held liable for the infringing acts of its subsidiaries: [i] joint tortfeasor and [ii] corporate veil-piercing." *Bally Schuhfabriken AG v. Bally Mfg. Corp.,* No. 92 Civ. 312, 1992 WL 80554, at *2 (N.D.Ill. Apr. 8, 1992).

(i) *Joint Tortfeasor*

"Because unfair competition and trademark infringement are tortious, the doctrine of joint tortfeasors" applies, and "[e]very person actively partaking in, lending aid to, or ratifying and adopting such acts is liable equally with the party itself performing these acts." *David Berg & Co. v. Gatto Int'l Trading Co.,* 884 F.2d 306, 311 (7th Cir.1989); *see also Microsoft*

---

**15.** Because Filene's liability is established by Filene's offering for sale (or sale) of the counterfeit Examined Items obtained from Ashley Reed, the Court need not reach Plaintiffs' alternative argument that Filene's purchased counterfeit Fendi-branded merchandise from Bungar and Summit. (*See* Pl. 56.1 ¶¶ 127, 135); *see also Duty Free Apparel,* 286 F.Supp.2d at 290 ("The plain language of the relevant statutes does not require that the plaintiff prove that a defendant committed the infringement in any particular amount, or with any amount of regularity.... [T]he amount of harm that the infringer inflicts goes to the amount of damages rather than to

his liability for damages ....") (citations omitted and alteration in original).

**16.** If the Court were to conduct an examination using the *Polaroid* factors, it would find that Filene's sale and offering for sale of goods bearing Fendi Marks, (*see* pp. 383–85, *supra*), created a strong likelihood of confusion. *See Romag Fasteners, Inc. v. J.C. Penney, Inc.,* No. 07 Civ. 1667, 2007 WL 4225792, at *6 (D.Conn. Nov. 28, 2007) ("[T]he *Polaroid* factors uniformly suggest that consumer confusion will be caused by the [counterfeit] snaps on the J.C. Penney handbags.").

*Corp. v. AGA Solutions, Inc.,* 589 F.Supp.2d 195, 202 (E.D.N.Y.2008) ("Having participated in the infringement, [defendants] are jointly and severally liable therefor."); *Bauer Lamp Co. v. Shaffer,* 941 F.2d 1165, 1171 (11th Cir.1991). In order for a defendant to be a joint tortfeasor, "[t]here must be a finding that the defendant and the direct infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties[,] or exercise joint ownership or control over the infringing product." *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157, 173 (S.D.N.Y. 1998) (quotation and citation omitted).

■ There are issues of fact (and credibility) related to Retail Ventures' alleged liability as a joint tortfeasor. *See Cline v. 1–888–PLUMBING Group, Inc.,* 146 F.Supp.2d 351, 372 (S.D.N.Y.2001) ("[T]here exist issues of material fact regarding what roles, if any, Campisi and BCPHI may have played in the alleged infringement."); *see also Yarchak v. Trek Bicycle Corp.,* 208 F.Supp.2d 470, 502–03 (D.N.J.2002). Such questions include, among others: (i) whether Retail Ventures and Filene's had an actual or apparent partnership, (*compare* Genecin Supp'l Decl. Ex. 39) (SEC Form 8–K, filed by Retail Ventures, Inc., dated July 5, 2005) ("Retail Ventures ... is a leading off-price retailer currently operating ... 27 Filene's Basement Stores ...") and Genecin Supp'l Decl. Ex. 41 (SEC Form 10–K for the Fiscal Year Ended Feb. 2, 2008, filed by Retail Ventures, Inc., dated Apr. 24, 2008 ("2008 Form 10–K")), at 6 ("We operate our business in the three segments described below: [including] Filene's Basement.") *and* Genecin Supp'l Decl. Ex. 42 (SEC Form 8–K, filed by Retail Ventures, Inc., dated Jan. 23, 2008) ("Retail Ventures ... continues to operate 36 Filene's Basement stores ... and 259 DSW stores ....") *with* Davis Decl. ¶ 9 ("As a holding company, Retail Ventures literally operates no retail, wholesale or other stores [and] does not purchase goods or import goods for resale[.]") and Davis Decl. ¶ 12 ("Filene's Basement is operated separately from Retail Ventures"); (ii) whether Retail Ventures and/or Filene's had authority to bind one another in transactions with third parties, (*compare* Genecin Supp'l Decl. Ex. 48 (Dep. of Heywood Wilansky, dated Oct. 23, 2007 ("Pls. Wilansky Dep. Supp'l Excerpts")), at 112:11–17 ("Q. Is it your understanding of the policy of Filene's Basement that before purchases could be made from third-party vendors of trademark merchandise, the company's [*i.e.,* Retail Ventures'] legal department had to clear the purchase? A. Roughly, that's my understanding.") *with* Davis Decl. ¶ 12 ("Filene's Basement is solely responsible for all operations of its now 25 operating retail stores, its corporate offices, and its warehouse.")); (iii) whether Retail Ventures exercised control over Filene's infringement(s) by: (a) approving Ashley Reed as a vendor for Fendi-branded goods, (*see* Pls. Wilansky Dep. Supp'l Excerpts at 112:3–17 ("Q. Back in June of 2003, who was the person within Filene's Basement who was responsible for reviewing indemnification letters signed by vendors? A. Well, first it would be the buyer.... And then next would be Julie Davis [*i.e.,* Executive Vice President, General Counsel, and Assistant Secretary of Retail Ventures] in our corporate legal.")); (b) overseeing Filene's compliance with trademark laws, (*see* Pls. Wilansky Dep. Supp'l Excerpts at 74:2–9 ("Q. Since you became [chief executive officer] of Filene's Basement ... who are the people in the company's legal department responsible for the company's compliance with the trademark laws? A. It would be our general counsel Julie Davis, and Shar[e]ika Pe[a]ks who works with [her]."), 93:5–8 ("Q. So [the Cease and Desist Letter] went to Julie Davis who is general counsel of Filene's Basement? A. General counsel of Retail Ventures, yes."));

and/or (c) training Filene's organization (including buyers) with respect to compliance with trademarks, (see Genecin Decl. Ex. 49 (Dep. of James Rudd, dated Dec. 12, 2007 ("Rudd Dep.")), at 160:13–18 ("Q. [W]ho are the people who receive training from the legal department [*i.e.*, Julie Davis and Shereika Peaks from Retail Ventures] concerning compliance with trademarks? A. It is my understanding that it's the merchant organization.").) [17]

## (ii) *Piercing the Corporate Veil*

■■■■ "To prevail on an alter ego claim under Delaware law, a plaintiff must show[:] (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness ... [is] present.'" *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1457 (2d Cir. 1995) (citation omitted). "Among the factors to be considered in determining whether a subsidiary and parent operate as a 'single economic entity' are: '[W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder.'" *Id.* at 1458 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.,*

No. Civ. A. 1331, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)); *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 139 (2d Cir.1991) ("the triers of fact are entitled to consider factors that would tend to show that defendant was a dominated corporation [including] overlap in ownership, officers, directors, and personnel[;] common ... address ... of corporate entities[;] the amount of business discretion displayed by the allegedly dominated corporation[;] whether the related corporations deal with the dominated corporation at arms length ...; [and] the payment or guarantee of debts of the dominated corporation by other corporations in the group").

There are issues of fact (and credibility) related to Retail Ventures' alleged alter ego liability. *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 184 (2d Cir.2008) ("Both the question of whether LHC was operated as Zimmerman's alter ego and the question of whether it was so operated in a way that shows fraud, illegality, bad faith, or an overall element of injustice or unfairness, remain to be answered by the factfinder after trial."); *Leber Assocs., LLC v. Entm't Group Fund, Inc.,* No. 00 Civ. 3759, 2003 WL 21750211, at *13 (S.D.N.Y. Jun. 29, 2003) ("[W]e find that genuine issues of material fact exist concerning whether Leber Associates and C2000 were alter egos during the events at issue in this lawsuit."). Among others, questions for a jury to de-

---

17. Fendi's counsel stated at oral argument that while Davis "was not an officer or director or employee of Filene's," she: "was responsible, starting on January 1, 2003, for Filene's ... compliance with trademark laws"; "conducted training, to the extent there was training, for Filene's ... buyers"; "was responsible for vetting and approving Filene's ... purchases from vendors"; and was "responsible for Filene's ... document production" in the instant litigation. (Hr'g Tr. at 4:4–13.) Fendi's counsel also argued that "Davis intentionally withheld a key docu-

ment in the case[,]" namely, "the indemnification agreement between Filene's ... and Ashley Reed" containing "the big black redaction in the center of it made by James Ressler of Ashley Reed." (Hr'g Tr. at 4:19–22.) Retail Ventures' counsel responded that "[w]ith respect to Ms. Davis ... the law is clear, there is nothing wrong with ... a holding company hiring a corporate counsel and having that counsel serve as the lawyer for the holding company and for the subsidiaries." (Hr'g Tr. at 8:20–24.)

cide include: (i) the amount of business discretion exercised by Filene's, (*compare* Davis Decl. ¶ 12 ("Filene's Basement is operated separately from Retail Ventures") *with* Genecin Supp'l Decl. Ex. 42 (SEC Form 8–K, filed by Retail Ventures, Inc., dated Jan. 23, 2008) ("Retail Ventures . . . continues to operate 36 Filene's Basement stores . . . and 259 DSW stores . . . .") *and* Feinberg Dep. at 7:16–8:10 ("Q. What exactly is Retail Ventures Services . . .? A. It is the company that all the Retail Ventures Services support employees work for. Q. And the Retail Ventures support employees, what are the activities that they support? A. Financial activities, IT activities, HR activities, warehousing and transportation activities[,] executive positions. . . . Q. And these activities, for what company or companies are these activities performed? A. For Filene's Basement . . . ."); *see also* pp. 378–78 & n. 7, *supra* ); (ii) whether Retail Ventures dealt with Filene's at arms length, (*see* Feinberg Dep. at 23:8–12 ("Q. [T]he financial reporting chain [for Filene's] does not go to the president of Filene's . . . but rather up to Retail Ventures . . . is that right? A. Correct.")); (iii) whether there was overlap between the ownership, officers, directors, and personnel of Retail Ventures and Filene's, (*see* Davis Decl. ¶ 14 ("Retail Ventures and Filene's had some common directors and officers in the past, [but] they did not have identical directors and officers")); (iv) whether Retail Ventures and Filene's shared a common address, (*compare* Answer ¶¶ 10, 12 (acknowledging that both Filene's and Retail Ventures have their "principal place of business at 3241 Westerville Road, Columbus, Ohio") *with* Davis Decl. ¶¶ 9–10 ("Retail Ventures is located, and has its sole offices, in Colum-

bus, Ohio. . . . Filene's . . . has its corporate offices in Burlington, Massachusetts, which are the offices that manage the day-to-day operations of the corporation and its now 25 operating retail stores")); (v) whether Retail Ventures paid or guaranteed debts of Filene's, (*see* 2008 Form 10–K at 17) ("The Filene's Basement Revolving Loan is guaranteed by Retail Ventures[.]"); and (vi) whether Retail Ventures operated Filene's in a manner that unfairly prejudiced the rights of Filene's creditors, (*see* Pls. Wilansky Dep. Supp'l Excerpts at 112:3–17 ("Q. [W]ho was the person within Filene's Basement who was responsible for reviewing indemnification letters signed by vendors? A. [Ultimately] Julie Davis in our corporate legal."), 74:2–9 ("Q. [W]ho are the people . . . responsible for the company's compliance with the trademark laws? A. [O]ur general counsel Julie Davis[ ] and Shar[e]ika Pe[a]ks[.]"); Feinberg Dep. at 23:8–12 ("Q. [T]he financial reporting chain [for Filene's] does not go to the president of Filene's . . . but rather up to Retail Ventures . . . is that right? A. Correct."); Feinberg Dep. at 7:16–8:10 ("Q. And these activities [including financial activities and executive positions], for what company or companies are these activities performed [by Retail Ventures Services]? A. For Filene's Basement . . . .")); *see also NetJets Aviation,* 537 F.3d at 184 ("The record . . . includes . . . evidence from which a reasonable factfinder could find that Zimmerman operated LHC in his own self-interest in a manner that unfairly disregarded the rights of LHC's creditors. . . . [A] reasonable factfinder could properly find that there was an overall element of injustice in Zimmerman's operation of LHC.").[18]

18. At oral argument, counsel for Retail Ventures argued that "there's a lot of we's in [Retail Ventures' filings with the U.S. Securities and Exchange Commission] because it says right at the beginning [of the filings], company or we is defined [in the] context of parent, subsidiary" and that "[y]ou can't write those [i.e., forms 10–K] if you have to

### (3) Common Law Unfair Competition

Plaintiffs argue, among other things, that "[p]roof of trademark counterfeiting ... under the Lanham Act also proves ... common law unfair competition under New York law." (Pl. Mem. at 8.) Defendants counter that there are genuine issue of material fact with regard to Defendants' liability for unfair competition. (*See* Def. Mem. at 16.)

■■■ To prevail on a common law claim of unfair competition, a plaintiff "must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [a defendant's] bad faith." *See Philip Morris USA Inc. v. Felizardo,* No. 03 Civ. 5891, 2004 WL 1375277, at *6, 2004 U.S. Dist. LEXIS 11154, at *22–24 (S.D.N.Y. June 18, 2004) (citing *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.,* 830 F.2d 1217, 1227–28 (2d Cir.1987)). "Under New York law, a presumption of bad faith attaches to the use of a counterfeit mark." *See id.*; *Philip Morris USA Inc. v. Felizardo,* No. 03 Civ. 5891, 2004 WL 1375277, at *6, 2004 U.S. Dist. LEXIS 11154, at *22–24 (S.D.N.Y. June 18, 2004) (citing *Centaur Commc'ns, Ltd. v. A/S/M Comc'ns, Inc.,* 830 F.2d 1217, 1227–28 (2d Cir.1987)); *see also Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980) ("The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another. Central to this notion is some element of bad faith.") (citations omitted).

Plaintiffs have established Filene's liability for trademark counterfeiting under the Lanham Act, (*see* pp. 382–85, *supra* ), and Filene's has offered no evidence to rebut the presumption of bad faith. *See Fendi Adele S.R.L.,* 689 F.Supp.2d at 599, 2010 WL 431509, at *8 ("Burlington's sale of counterfeit Fendi-branded merchandise allows this Court to infer bad faith; therefore, summary judgment is appropriate as to Fendi's common law claims of unfair competition."); *Cartier Int'l B.V. v. Ben–Menachem,* No. 06 Civ. 3917, 2008 WL 64005, at *13 (S.D.N.Y. Jan. 3, 2008); *Burberry,* 2009 WL 1675080, at *15 ("Because Burberry's claims under New York state law are reviewed based on the federal law standard (*i.e.*[,] that of sections 32(1)(a) and 43(a) of the Lanham Act), [defendants] are also liable for unfair competition under New York and common law.").[19]

At the same time, because there remain issues of fact (and credibility) related to Retail Ventures' alleged liability as an alter ego of Filene's, (*see* pp. 386–89, *supra* ), summary judgment is also precluded on Plaintiffs' unfair competition claim against Retail Ventures. *See Kensington Pub. Corp. v. Gutierrez,* No. 05 Civ. 10529, 2009 WL 4277080, at *7 (S.D.N.Y. Nov. 10, 2009) ("[G]enuine issues of material fact preclude the grant of summary judgment ... with respect to the New York unfair competition claim.").

### (4) Trademark Dilution

Plaintiffs argue, among other things, that they are entitled to summary judg-

---

each time point out I'm not talking about the other companies." (Hr'g Tr. at 9:12–16.)

**19.** The record also reflects bad faith because, as noted above, (*see* pp. 374–75, *supra* ), after Filene's received the Cease and Desist Letter in 2001, it purchased goods from Ashley Reed without conducting any investigation into the goods' authenticity and despite James Ressler's redaction of a warranty that "Seller has the legal right to sell the Merchandise." (Pl. 56.1 ¶¶ 206–08; Def. 56.1 ¶¶ 206–08: *see also* Defs. Quinn Dep. Excerpts at 144:10–18 ("Q. [H]aving Mr. Ressler sign that letter, was that the only step that anybody in the company took ... ? A. Yes. Q. And based on that letter, you felt that was sufficient to give you confidence that you were not purchasing counterfeit goods? A. Yes.").)

ment on their claim for trademark dilution under 15 U.S.C. § 1125(c) because "Defendants admit that they used the Fendi name and trademarks in commerce after the marks had become famous"; and under Section 360-*l* of the New York General Business Law because "Defendants' use of identical marks is not only confusing, but constitutes a whittling away of the distinctive nature of [P]laintiffs' valuable trademarks." (Pl. Mem. at 7–9.) Defendants counter that "there are factual questions as to the merits of [Fendi's] claims" of trademark dilution under Federal and state law. (*See* Def. Mem. at 15.)

▇ The Federal Trademark Dilution Act of 1995 ("FTDA"), as amended effective October 6, 2006 by the Trademark Dilution Revision Act ("TDRA"), "entitles the owner of a famous, distinctive mark to an injunction against the user of a mark that is 'likely to cause dilution' of the famous mark." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 477 F.3d 765, 766 (2d Cir.2007) (citing 15 U.S.C. § 1125(c)(1)). Congress enacted the TDRA "in response to [a 2003] Supreme Court[ ] decision ... constru[ing] the FTDA to require a showing of actual dilution, as opposed to a likelihood of dilution." *Id.* However, the TDRA's "more lenient standard ... only appl[ies] to pre-October 6, 2006 conduct to the extent that a plaintiff seeks injunctive relief, and not money damages." *Burberry,* 2009 WL 1675080, at *9 (citing *Starbucks Corp.,* 477 F.3d at 766).

▇ Because Plaintiffs seek both monetary and injunctive relief, (*see* Compl. at 79), and because it is undisputed that Filene's began using the Fendi Marks prior to October 6, 2006, (*see* Compl. ¶ 72; Answer ¶ 72), the Court applies the FTDA's more stringent test of actual dilution. *See Dan–Foam A/S v. Brand Named Beds, LLC,* 500 F.Supp.2d 296, 305–06 n. 87 (S.D.N.Y.2007) ("To the extent that [a claim based on pre-October 6, 2006 con-duct] seeks monetary relief for its dilution claim, the FTDA standard for obtaining remedies other than injunctive relief still governs."). As shown below, with respect to Filene's, Plaintiffs have established that: "[i] [plaintiffs'] mark is famous; [ii] the defendant is making commercial use of the mark in commerce; [iii] the defendant's use began after the mark became famous; and [iv] the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 454 F.3d 108, 118 (2d Cir. 2006). And, as explained below, (*see* p. 391, *infra* ), there are issues of fact as to Retail Ventures' alleged liability for trademark dilution under Federal and state law.

### (i) *Fame*

It is undisputed that each of the Fendi Marks is famous. (Compl. ¶ 71; Answer ¶ 71); *see Dooney & Bourke,* 454 F.3d at 118.

### (ii) *Commercial Use in Commerce*

Filene's "sale of merchandise bearing [plaintiffs' marks to] third party retail entities satisfies this element." *Burberry,* 2009 WL 1675080, at *13; (*see* pp. 382–85, *supra* ); *see also Louis Vuitton Malletier v. Veit,* 211 F.Supp.2d 567, 578–79 (E.D.Pa.2002) ("Defendants' use of [p]laintiffs' Registered Trademarks.... in order to sell their counterfeit goods ... constitutes [d]efendants' commercial use in commerce of [p]laintiffs' Registered Trademarks.").

### (iii) *Filene's Used the Marks After They Became Famous*

It is undisputed that Filene's used Fendi's famous marks and trade name in commerce after the marks had become famous. (Compl. ¶ 72; Answer ¶ 72); *see also Savin Corp. v. Savin Group,* 391 F.3d 439, 449 n. 4 (2d Cir.2004).

### (iv) *Dilution*

Plaintiffs argue that there is actual dilution because "[i]t is undisputed that [D]efendants used marks that mimic the registered marks that Fendi owns." (Pl. Mem. at 8–9.) Defendants do not appear to respond to this argument. (*See* Def. Mem. at 1–25.)

"In cases analyzing dilution under the [FTDA], courts have held counterfeit marks to be identical to the senior mark." *Burberry*, 2009 WL 1675080, at *14 (citing *Savin*, 391 F.3d at 452–53); *see also* 15 U.S.C. § 1127 (defining a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark").

Plaintiffs have shown that Filene's use of the Fendi Marks dilutes the quality of the Marks by diminishing their capacity to identify and distinguish the Fendi Products. *See Am. Honda Motor Co. v. Pro–Line Protoform*, 325 F.Supp.2d 1081, 1085 (C.D.Cal.2004). And, Defendants have failed to rebut this showing with any evidence. *See id.* Filene's offered for sale and sold counterfeit merchandise bearing one or more of the Fendi Marks, (*see* pp. 382–85, *supra*), and the record reflects that the marks on the counterfeit Examined Items are virtually identical to, or exact replicas of, one or more of the Fendi Marks. (*See* Genecin Decl. Exs. 1–5; Supp'l Decl. of Victor Genecin, dated Jan. 15, 2010 ("Genecin 2d Supp'l Decl."), Exs. 78–92; Pl. 56.1 ¶¶ 121–22; Def. 56.1 ¶¶ 121–22); *Savin*, 391 F.3d at 453: *Burberry*, 2009 WL 1675080, at *15; *Gen. Motors Corp. v. Autovation Tech., Inc.*,

317 F.Supp.2d 756, 757 (E.D.Mich.2004); *see also Fendi Adele S.R.L.*, 689 F.Supp.2d at 598, 2010 WL 431509, at *7 ("The marks at issue in this case are identical, and Burlington has put forward no evidence to overcome the presumption of actual dilution"); *Savin*, 391 F.3d at 452–53.[20]

At the same time, the issues of fact (and credibility) related to Retail Ventures' alleged liability as an alter ego of Filene's, as noted above, (*see* pp. 387–89 & 389, *supra* ), also preclude summary judgment for Plaintiffs as to their dilution claims against Retail Ventures under Federal and state law. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, No. 01 Civ. 5981, 2004 WL 2158120, at *8 (S.D.N.Y. Sept. 28, 2004) ("[F]actual issues preclude resolution of [p]laintiffs' dilution claims on summary judgment.").

### (5) **Permanent Injunction**

Plaintiffs argue that Defendants should be permanently enjoined from, among other things, "purchasing, offering for sale, or selling any item bearing the word 'Fendi' or any Fendi trademark unless they have first obtained written permission from [P]laintiff Fendi S.r.l." (Pl. Mem. at 9–10.) Defendants counter that the injunctive relief sought by Plaintiffs is "draconian" and "anything but narrow." (Def. Mem. at 19–20.)

Plaintiffs are entitled to a permanent injunction prohibiting Filene's from purchasing, offering for sale, or selling any item bearing the word "Fendi" or any of the Fendi Marks without Plaintiff Fendi

---

**20.** Because the FTDA's dilution standard is at least as stringent as New York State law, Plaintiffs are also entitled to summary judgment under Section 360–*l* of the New York General Business Law. *See Burberry*, 2009 WL 1675080, at *10 n. 3 ("Under the [FTDA], courts treated state and federal dilution claims as effectively the same."), *15

("Burberry has made a sufficient showing of dilution *per se,* and its motion for summary judgment on its federal and state claims of dilution is granted."); *see also Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 n. 1 (2d Cir.1999), *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003).

S.r.l.'s written permission because, among other reasons, Plaintiffs have succeeded on the merits of their trademark counterfeiting and false designation of origin claims against Filene's. (*See* pp. 382–85, *supra*); *see also Bellagio Jewelry, Inc. v. Croton Watch Co.*, No. 06 Civ. 6672, 2008 WL 3905895, at *18 (C.D.Cal. Aug. 20, 2008) ("Defendant is permanently enjoined from the use of [p]laintiffs' registered trademark ... without the express written permission of [p]laintiffs."). Indeed, Filene's concedes that Plaintiffs have no adequate remedy at law for trademark counterfeiting and false designation of origin. (*See* Answer f 67 ("FENDI has no adequate remedy at law" for trademark counterfeiting).) Plaintiffs have also shown likelihood of confusion, (*see* pp. 382–85, *supra*), and, thereby, established irreparable harm. *See Duty Free Apparel*, 286 F.Supp.2d at 290 ("The preceding discussion establishes Gucci's success on the merits, and in this Circuit, a showing of likelihood of confusion establishes irreparable harm[.]"); *see also Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir.2009); *L. & J.G. Stickley*, 255 Fed.Appx. at 543.

■■■ Filene's argument that the injunctive relief sought by Plaintiffs is not narrowly tailored is unpersuasive because "[a] district court must be permitted to fashion an 'injunction which will keep a proven infringer safely away from the perimeter of future infringement.'" *Versace v. Versace*, 213 Fed.Appx. 34, 36 (2d Cir.2007) (quoting *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir.2003)); *see also id.* ("[W]e have recognized that 'a party who has once infringed a trademark may be required to suffer a position less advantageous than that of an innocent party.'" (quoting *Oral–B Labs., Inc. v. Mi–Lor Corp.*, 810 F.2d 20, 24 (2d Cir.1987))).

Plaintiffs' request for a permanent injunction against Retail Ventures is denied without prejudice. That is, because Plaintiffs have failed to show that they are entitled to summary judgment as to Retail Ventures' liability, "a permanent injunction would be premature." *Fourte v. Countrywide Home Loans, Inc.*, No. 07 Civ. 1363, 2009 WL 2998110, at *7 (D.N.J. Sept. 15, 2009).

### (6) Destruction of Counterfeit Goods

Plaintiffs argue that they are entitled to an Order pursuant to 15 U.S.C. § 1118 directing the destruction of counterfeit and other infringing goods in Defendants' possession. (*See* Pl. Mem. at 11.) Defendants do not appear to respond to this argument. (*See* Def. Mem.)

■■■ Because, as noted, (*see* pp. 391–92, *supra*), the Court is entering a permanent injunction against any further infringement by Filene's, Plaintiffs' application for an order pursuant to 15 U.S.C. § 1118 is denied. *See Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 589 F.Supp.2d 25, 33 (D.D.C.2008) ("[W]here an injunction is issued under the Lanham Act enjoining an infringer from further infringement, the rights of the plaintiff are adequately protected and an order requiring destruction of infringing articles ... may be unnecessary."); *see also Kelley Blue Book v. Car–Smarts, Inc.*, 802 F.Supp. 278, 293 (C.D.Cal.1992) ("In light of the injunction ... entered by the [c]ourt in this matter, an order requiring the destruction of any infringing articles in the possession of the defendants is unnecessary.").

### (7) Accounting of Filene's Profits

Plaintiffs argue, among other things, that Filene's accepted the purchase agreement as executed by Ashley Reed, despite the fact that James Ressler blacked out a paragraph containing a warranty of Ashley Reed's "legal right to sell the Merchan-

dise"; and that Filene's "failure to inquire about the genuineness of [Ashley Reed's] goods constituted willful blindness." (Pl. Reply at 15, 17.)[21] Defendants counter that there was "nothing about the transactions with Ashley Reed that caused any concern that the products were anything other than genuine Fendi-branded goods"; and that Fendi "certainly presents no conclusive evidence that Filene's recklessly disregarded the possibility of infringement or that it suspected any wrongdoing by Ashley Reed." (Def. Mem. at 17–18 (emphasis omitted).)

■ A plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting. *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir.1995) (quoting *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir.1992)); *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir.1996); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 500 F.Supp.2d 276, 278, 280 (S.D.N.Y.2007). "The standard for willfulness is 'whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility.'" *Nike, Inc. v. Top Brand Co.*, No. 00 Civ. 8179, 2005 WL 1654859, at *6, 2005 U.S. Dist. LEXIS 42374, at *19–20 (S.D.N.Y. July 13, 2005) (quoting *Kepner–Tregoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d Cir.1999)); *Tanning Research Labs., Inc. v. Worldwide Imp. & Exp. Corp.*, 803 F.Supp. 606, 610 (E.D.N.Y. 1992). "[K]nowledge includes a willful blindness or a failure to investigate because one was afraid of what the inquiry would yield." *Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 591–92 (7th Cir.2007) (quotation and citation omitted). Willful blindness "does not lie unless the defendant knew of a high probability of

illegal conduct and purposefully contrived to avoid learning of it, for example, by failing to inquire further out of fear of the result of the inquiry." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 513, 515 (S.D.N.Y.2008).

■ The Court finds that there are issues of fact (and credibility) surrounding Filene's willfulness. *See In re Dana Corp. (Jasco Tools, Inc. v. Dana Corp.)*, 574 F.3d 129, 152 (2d Cir.2009). Factual questions for a jury to decide include: (i) whether Filene's sales of Fendi-branded goods after receiving the Cease and Desist Letter in 2001 and a second cease and desist letter in 2005 (and after the filing of this lawsuit) constituted willful infringement, (*see* Stockton Decl. Ex. 11 (Dep. of Lisa J. Honig, dated Jan. 9, 2008 ("Honig Dep.")), at 130:7–14 ("Am I correct that during the time period when you were … buying Fendi-trademarked handbags from Ashley Reed … you had no awareness of [the Cease and Desist Letter]? A. I don't remember being aware of that, I really don't. I find it hard to believe that I didn't, but I don't recall that.")); *see also Cache, Inc. v. M.Z. Berger & Co.*, No. 99 Civ. 12320, 2001 WL 38283, at *15 (S.D.N.Y. Jan. 16, 2001) ("[T]here is an issue of fact as to whether the retail defendants' continued sales after the plaintiff sent cease and desist letters and after the filing of this lawsuit constituted willful infringement on the part [of] these retail sellers."); (ii) whether Filene's knew or recklessly disregarded the fact that Fendi-branded goods it was purchasing were not genuine, (see Decl. of Cynthia A. Quinn, dated Mar. 24, 2009, ¶ 22 ("[B]ased on our examination of the Fendi items in question, we believed that they were genuine, in part because we believed that they were high quality."); Honig Dep. at 135:15–136:1 ("Q. Is there anything that you can recall about the transactions that

21. *See* p. 387 n. 17, *supra*.

you made with Ashley Reed that would have caused you any concern that the products that you were purchasing were anything other than genuine Fendi-branded handbags? A. No. Q. Do you have any knowledge that any of the Fendi-branded handbags you purchased on behalf of Filene's ... from Ashley Reed were anything other than genuine Fendi-branded handbags? A. I don't."); Defs. Quinn Dep. Excerpts at 144:10–18 ("Q. [H]aving Mr. Ressler sign th[e] letter [from which the legal right to sell provision was redacted], was that the only step that anybody in the company took [before] buying ... goods from Mr. Ressler? A. Yes. Q. And based on that letter, you felt that was sufficient to give you confidence that you were not purchasing counterfeit goods? A. Yes.")); and (iii) whether the failure by Filene's to investigate the origin(s) of its Fendi-branded goods constituted willful blindness, (see pp. 374–75, supra; Pls. Barr Dep. Excerpts at 59:2–60:17 ("Q. So you knew in July of 2001 that Filene's Basement was allegedly selling counterfeit trademark handbags; is that right? A. [Y]es.... Q. But after that, you'd never again raised a question about whether those stores were supposed to have those handbags; is that right? A. That's correct."); Defs. Quinn Dep. Excerpts at 155:6–12 ("Q. Did he [i.e., James Ressler] tell you which stores? A. No, he didn't tell me the stores. Q. Did he tell you which factories? A. No, he did not. Q. So you don't know whether it was Fendi factories or not? A. In my mind, it was Fendi factories."), 68:9–11 ("Q. Were you shown any documents by Mr. Ressler to prove what he was saying to you [about his sources for Fendi-branded goods]? A. No."); Defs. Quinn Dep. at 140:16–17 ("Whatever we buy in designer handbags are real handbags. That's what we buy."); Defs. Quinn Dep. Excerpts at 142:21–143:10 ("Q. So when you say you can identify counterfeit merchandise ... what en-

ables you [to do so?] A. Well, I would think the people we are doing business with are being upfront about it, obviously selling us original designer product. Q. So is what you are saying to me that you trust your vendors? A. Yes. Q. Would it be fair to say that the counterfeiting of trademarked merchandise is a problem in the fashion industry? A. That would be fair.")); see also Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263–64 (2d Cir.2005) ("A [finder of fact] could, without doubt, conclude that [defendant's] statements reveal willful blindness, or establish a pattern of conduct so unreasonable as to constitute reckless disregard. Still, it is not beyond peradventure that a reasonable [finder of fact] would conclude otherwise. And that is enough to make summary judgment on the issue of willfulness inappropriate.").

## (8) Crossmotion to Strike Damages Report and Trademark Registrations

Defendants argue that the Court should strike the report of James Donohue, Fendi's damages expert, because he "based his damages analysis on the so-called 'incremental profit' method of accounting." (Def. Mem. at 21–24.) Defendants also argue that if Fendi "opt[s] to seek statutory damages at trial ... any claim ... for statutory damages cannot be based on: [1] Registration Nos. 1,214,472 and 2,648,257; [2] Registration No. 1,439,955 for wallets; or [3] Registration No. 1,244,466 for handbags." (Def. Mem. at 21–24.) Plaintiffs counter that Defendants "should not be allowed to deduct any indirect or overhead expenses" because Defendants cannot "connect their claimed expenses to their sales of counterfeit Fendi[-]branded goods." (Pl. Reply at 20–21.) And, Plaintiffs argue that the "question of [D]efendants' exposure to statutory damages need not be addressed unless there is a trial and

[P]laintiffs elect statutory damages." (Pl. Reply at 24.)

Defendants' request to strike Plaintiffs' expert report and damages analysis is denied without prejudice. *See Cargill, Inc. v. Sears Petroleum & Transp. Corp.,* 334 F.Supp.2d 197, 251 (N.D.N.Y.2004) ("Because of the posture of the case, I will deny [defendant's] application to strike the ... expert reports, without prejudice to the right to object to the admission of his testimony, wholly or in part, at trial or through motion in limine filed prior to trial.").

And, Defendants' request to strike Plaintiffs' reliance on certain Federal trademark registrations is denied without prejudice. *See Sauer v. Xerox Corp.,* 938 F.Supp. 155, 166 (W.D.N.Y.1996) ("In light of the above dispositions, Xerox's motion to strike Sauer's prayer for punitive damages is denied without prejudice to renewal at the time of trial, pending determination of the claims to be submitted [to the factfinder]"); *Avnet, Inc. v. Am. Motorists Ins. Co.,* 684 F.Supp. 814, 817 (S.D.N.Y. 1988) ("Defendant's motion to strike is denied, without prejudice to raise the issue at a later time.").

## V. Conclusion and Order

For the foregoing reasons, Plaintiffs' motion for summary judgment [# 90] is granted as to Defendants affirmative defenses and as to Plaintiffs' claims against Defendant Filene's Basement, Inc. of trademark counterfeiting and false designation of origin under the Lanham Act, common law unfair competition under New York law, and trademark dilution under 15 U.S.C. § 1125(c) and Section 360–*l* of the New York General Business Law.

Defendants' crossmotion for partial summary judgment [# 119] dismissing Retail Ventures, Inc. as a party is denied. Plaintiffs' claims against Retail Ventures, Inc. of trademark counterfeiting and false designation of origin under the Lanham Act, common law unfair competition under New York law, and trademark dilution under 15 U.S.C. § 1125(c) and Section 360–*l* of the New York General Business Law may go forward to trial.

Plaintiffs' applications for an accounting of Defendants' profits and for injunctive relief against Retail Ventures, Inc. are denied without prejudice. Plaintiffs' application for an order of destruction pursuant to 15 U.S.C. § 1118 is denied.

Defendants' crossmotion is denied without prejudice as to their requests to strike Fendi's expert report and to strike reliance on certain Federal trademark registrations.

**IT IS HEREBY ORDERED** that Defendant Filene's Basement, Inc. is permanently enjoined under section 34(a) of the Lanham Act from purchasing, offering for sale, or selling any item bearing the word "Fendi" and/or any of Fendi's registered trademarks without the express written permission of Plaintiff Fendi S.r.l.

The parties and counsel are directed to appear before the Court for a scheduling/settlement conference on April 1, 2010, at 11:30 a.m., in Courtroom 21B of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York. **The parties are directed to engage in good-faith settlement negotiations prior to the conference.**